UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| TRUETT SAVAGE, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | No. 3:23-cv-01190 |
| CHARIOT LOGISTICS, INC., | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION

This employment case arises from Truett Savage's claim that her former employer, Chariot Logistics, Inc. (Chariot), discriminated and retaliated against her in violation of federal and state law. Before the Court is Chariot's Motion for Summary Judgment (Doc. No. 44), which has been fully briefed and is ripe for review (see Doc. Nos. 47, 48, 51, 56). For the following reasons, Chariot's Motion will be granted in part and denied in part.

**I.   BACKGROUND AND UNDISPUTED FACTS[1]**

Savage began working for Chariot as its first Human Resources Manager in February 2022. (Doc. No. 48 ¶ 1). In this role, Savage was responsible for "coaching managers and employees, facilitating and streamlining performance review processes, planning employee engagement initiatives, benefit administration, posting job openings, screening applicants, scheduling interviews, and on-boarding new hires." (Id. ¶ 2). Chariot's upper management team included President Joseph DiLeo ("DiLeo") and Vice President Alex Schnitzer ("Schnitzer"), both of whom were part owners. (See Doc. No. 1 ¶¶ 18, 29). Savage initially reported to DiLeo, but she began

---

[1] The facts in this section are undisputed unless noted otherwise and are drawn from the undisputed portions of Chariot's statements of undisputed material facts (Doc. No. 48), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record.

reporting to Vice President of Finance Andy Marcum ("Marcum") starting in September 2022. (Doc. No. 48 ¶¶ 3–4). The parties dispute whether Schnitzer ever supervised Savage, but Savage claims that as "second in command" he had authority over all employees. (Id. ¶ 49).

Savage became troubled by "inappropriate comments, questions, and considerations" at Chariot. (Doc. No. 47 at 3–4). For example, she testified that Schnitzer said "woman are too emotional and can't handle some of the positions they are in," "he would prefer not to hire women," and he wanted to hire women without children. (Doc. No. 44-2 at 124). Schnitzer said that black people "tended to be late to work or not have reliable transportation, that they lived in the ghetto, and they brought problems." (Id. at 126–27). He also told Savage that he "didn't want to hire" someone who was "too old" because that candidate "just wanted a job until he retired." (Id. at 167). DiLeo put measures in place to determine candidates' "age, sex, and race" before hiring them, and he resisted recruiting women into leadership positions. (Doc. No. 49-3 at 4). He also commented that an older black women candidate "did not meet the chariot demographics." (Id.). Savage claims that she "repeatedly and regularly opposed these actions" by telling Schnitzer and DiLeo that their comments were inappropriate and that they could not consider legally protected statuses when hiring employees. (Doc. Nos. 49-11 ¶¶ 12–13; 47 at 5 (collecting record citations)).

Savage also asserts that Schnitzer sexually harassed her and displayed inappropriate behavior while she worked at Chariot. Much of Schnitzer's conduct is *undisputed*:

- He said he and his wife "had an agreement that she had to put out" if she wanted him to buy her things. (Doc. No. 48 ¶ 37).

- He said he hoped "his wife [was] in the mood to do what married couples do" as he was scrolling on his phone. (Id. ¶ 38).

- He said his wife "better plan on having a lot of sex" on their trip to Jamaica. (Id. ¶ 39).

- He told Savage "you look good girl," and that her braid reminded him of a basketball player. (Id. ¶ 40).

- He made "a comment about [Savage's] legs." (Id. ¶ 41).

- He told Savage that her skirt looked nice and that she looked nice and festive. (Id. ¶ 42).

- He "jokingly" asked Savage to massage his knee. (Id. ¶ 43).

- He asked Savage why she kept "adjusting her shirt" during a meeting, and whether it was because she thought he was looking at her chest. (Id. ¶ 44).

- He once stated that his hand "almost touched something it shouldn't have" as he passed her near the water cooler. (Id. ¶ 45).

- He commented that he "bet [Savage] was easy in college." (Id. ¶ 46).

- He brushed against Savage's breast when he put his arms on her desk in front of her. (Id. ¶ 47).

- On another occasion, his arms brushed against Savage's breast when he reached over "directly in front of" Savage to grab some M&Ms Savage offered him. (Id. ¶ 48).

According to Savage's deposition testimony, Schnitzer also engaged in the following nonexhaustive list of conduct:

- He told Savage that she "must spend all of [her] husband's money," and that if his wife wanted anything over a certain amount, "they had an agreement that she had to put out." (Id. ¶ 37).

- He made inappropriate comments about intimacy more than a hundred times. (Id. ¶ 38).

- He made multiple comments about her appearance, including her hair, lipstick, shirt, skirt, outfit, and wedding ring. (Id. ¶ 41).

- He told Savage that she was "easy in college" at least twice, and that she was "so easy, you're just like my wife" at least once. (Id. ¶¶ 42, 46).

- He brushed against her breasts at least three times, and brushed against her butt once. (Id. ¶¶ 47–48).

Savage further testified that Schnitzer made some of these comments when discussing her request for a pay raise, which indicated that "his advances . . . towards me would have been what was the deciding factor for me to get what I was asking for."  (Doc. No. 44-2 at 181).

Savage testified that she repeatedly told Schnitzer and others that his comments were inappropriate.  (See Doc. No. 49-4 at 202).  She further stated that she "responded to . . . everything" Schnitzer did, but she does not "remember what" she said each time.  (See, e.g., Doc. No. 48 ¶ 40).  She alleges "[d]ue to [her] advocacy for protected groups and opposition to Chariot's widespread discrimination and harassment, [she] was left out of key HR decisions, was unfairly disciplined, had job duties taken away from her, was asked to perform menial tasks such as running errands for upper management, and was denied a promised promotion to Director."  (Doc. No. 1 ¶ 27).

On November 29, 2022, DiLeo issued Savage a verbal warning and gave her a "Corrective Action Plan."  (Doc. No. 48 ¶ 15; Doc. No. 44-8).  Chariot asserts that it issued Savage a verbal warning because, among other things, she did not use LinkedIn as a recruiting platform, failed to notify Chariot's third-party vendor of updated benefit deductions for its employees, and failed to implement a structured performance evaluation process and was often unprepared for performance reviews.  (Doc. No. 48 ¶¶ 8–15).  On January 24, 2023, DiLeo terminated Savage's employment because, according to Chariot, she had "continued poor performance and fail[ed] to correct the issues identified in her Corrective Action Plan."  (Id. ¶ 23).

Savage disagrees with Chariot's proffered reasons for terminating her, and instead argues that she was fired because she opposed discriminatory practices, sexual harassment, and other illegal activity at the company.  As a result, Savage brought this lawsuit against Chariot alleging four causes of action.  (Doc. No. 1).  Savage clarified that these four causes of action "can be

sorted into three categories" as follows: (1) she was discriminated against based on her sex and her advocacy for "protected classes," in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA"); (2) she was retaliated against for "opposing illegal activity and advocating for protected classes," in violation of Title VII, the THRA, Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), the Age Discrimination in Employment Act ("ADEA"), and the Fair Labor Standards Act ("FLSA"); and (3) she was subjected to a sexually hostile work environment and *quid pro quo* sexual harassment, in violation of Title VII and the THRA. (Doc. Nos. 1 ¶¶ 70; 47 at 11–12). Chariot has moved for "summary judgment in its favor as to all claims[.]" (Doc. No. 44).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). In deciding a motion for summary judgment, the Court generally reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter, and instead determines only whether sufficient evidence has been presented to make a material issue of fact a proper jury question. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

As an initial matter, Savage argues that Chariot's initial motion "offered *no* arguments regarding [her] discrimination claims[.]" (Doc. No. 47 at 13). The Court agrees. Although Chariot attempts to correct this oversight by raising arguments in its reply brief (see Doc. No. 51 at 4), the general rule is that "arguments raised for the first time in reply briefs are waived[.]" See Palazzo v. Harvey, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019). Thus, to the extent Chariot moved for summary judgment on Savage's discrimination claims, that aspect of Chariot's motion will be denied without further analysis.

That leaves Savage's claims for retaliation, sexually hostile work environment, and *quid pro quo* sexual harassment. The Court will address each of these claims below.

### A. Retaliation

#### 1. FLSA

The Court first finds that Chariot is clearly entitled to summary judgment on Savage's FLSA retaliation claim. The FLSA's antiretaliation provision prohibits an employer from discharging or discriminating against an employee who engages in specified *protected activity*. 29 U.S.C. § 215(a)(3). As relevant to the instant motion, an employee engages in protected activity when she "file[s] any complaint or institute[s] or cause[s] to be instituted any proceeding under or related to" the FLSA.[2] Id. Not every complaint constitutes protected activity under the FLSA, however, as "there is a legally cognizable distinction between the performance of job duties and the assertion of one's own FLSA rights or the rights of others." Pettit v. Steppingstone, Center for the Potentially Gifted, 429 F. App'x 524, 530 (6th Cir. 2011). For an employee, like

---

[2] The Complaint does not allege that Savage engaged in any other type of protected activity listed in 29 U.S.C. § 215(a)(3), including testifying in a proceeding under the FLSA, or serving or preparing to serve on an industry committee.

Savage, who is "specifically tasked with personnel or human resources duties, dealing with FLSA compliance is part of the job, to be undertaken with the interests of the employing company in mind." Id. at 530–31. Thus, "[u]nder the FLSA manager rule, conduct undertaken while performing assigned human resource jobs and undertaken for the purpose of protecting the interests of the employer is not protected activity." Jackson v. Genesee Cnty. Road Com., 999 F.3d 333, 346 (6th Cir. 2021) (citations and internal quotation marks omitted).

Savage argues that she engaged in protected activity under the FLSA, and was retaliated against, when she pushed back against DiLeo's January 16, 2023 company-wide email with the subject line "No Unapproved Overtime." (See Doc. Nos. 48 ¶ 34; 44-16). In that email, DiLeo was "reminding non-exempt employees to clock out during meal periods and telling them that if they failed to do so it would be done for them." (Doc. No. 48 ¶ 34 (internal quotation marks and alterations omitted)). Savage responded to the email "clarifying with Chariot managers and employees that if employees were working through their scheduled meal period, they would be compensated." (Id. ¶ 36).

Savage asserts that her email constitutes protected activity because she was making sure Chariot complied with the FLSA's overtime provisions. (See id. ¶ 35). But Savage did not step outside her role as an HR professional when she responded to DiLeo's email, nor did she use "threatening language." See Pettit, 429 F. App'x at 527 (holding that FLSA manager rule did not apply to threat by Director of Human Resources "to report unlawful activity to the U.S. Department of Labor"). Accordingly, the FLSA manager rule applies, and Savage's "push back" against DiLeo's overtime email is insufficient, as a matter of law, to support her FLSA retaliation claim.

2. Title VII, THRA, § 1981, ADEA

The Sixth Circuit has refused to extend the FLSA manager rule to claims brought under Title VII. Jackson, 999 F.3d at 346 (holding that an HR Manager or employee can rely on his or

7

her conduct and "job responsibilities to maintain a [retaliation] claim under Title VII's opposition clause"). By extension, the Court does not find that the FLSA manager rule is a bar to Savage's retaliation claims under the ADEA, Title VII, the THRA, and § 1981. The Court analyzes these four claims under the same legal framework. Jackson v. Board of Educ. of Memphis City Sch of Memphis, Tenn., 494 Fed. Appx 539, 543 n.1 (6th Cir. 2012) (THRA and § 1981 retaliation claims governed by Title VII standard); Fox v. Eagle Distributing Company, Inc., 510 F.3d 587, 591 (6th Cir. 2007) (applying Title VII retaliation framework to retaliation claim under the ADEA).

To survive summary judgment, Savage must support her retaliation claims "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 543 (6th Cir. 2008) (citation omitted). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation is a motivating factor in the employer's action." Id. at 543–44 (citations omitted). "Circumstantial evidence is proof that does not show retaliation 'on its face' but permits a 'reasonable inference' that it occurred." See Young v. Bernhard MCC, LLC, 602 F. Supp. 3d 1065, 1070 (M.D. Tenn. 2022) (citing Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012)). Courts only apply the well-known burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973) if the plaintiff lacks direct evidence of retaliation and relies on circumstantial evidence to prove her claim.

The Court disagrees with Savage that she presented direct evidence of retaliation, particularly because her alleged proof requires the Court to make substantial inferences to conclude that unlawful retaliation led to her termination. (Doc. No. 47 at 14). Thus, the Court analyzes whether there is sufficient circumstantial evidence of retaliation using the McDonnell-Douglas

framework referenced above. That is, Savage bears the initial burden to establish a prima facie case of retaliation. See Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 381 (6th Cir. 2002). Only after making this showing does the burden shift to Chariot to articulate a legitimate, nondiscriminatory reason for its actions, after which the burden would return to Savage to show that Chariot's proffered reason was mere pretext for retaliation. See, e.g., Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003).

To state a prima facie claim of retaliation, Savage must show: (1) she engaged in protected activity under the ADEA, Title VII, the THRA, and § 1981; (2) Chariot knew of that activity; (3) Chariot took an adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action. See Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 381 (6th Cir. 2002). Chariot only challenges the first and fourth prong of this test, namely whether Savage engaged in protected activity and, if so, whether there is a causal connection to the adverse employment action, in this case, her termination.

"Protected activity" includes opposing a practice declared discriminatory under the relevant statute at issue. See Foust v. Metro. Sec. Servs., Inc., 829 F. Supp. 2d 614, 628–29 (E.D. Tenn. 2011) (citing Johnson v. Univ. of Cincinnati, 215 F.3d 561, 581 (6th Cir. 2000)). A plaintiff can oppose a discriminatory practice by "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." Id. at 629. The Court finds that there is more than sufficient evidence to show that Savage, as the HR Manager, engaged in protected activity by opposing what she believed to be discriminatory employment practices at Chariot related to race, sex, and age. She testified that almost from day one as Chariot's HR Manager, she challenged the company's discriminatory employment practices by, among other things, (i) telling Schnitzer that his sexual and racial comments and behavior were unacceptable;

and (ii) criticizing management's statements about not wanting to hire women, black people, gay people, or older applicants. (Doc. No. 48 ¶¶ 31–32, 37–48; see also Doc. Nos. 44-2 at 124, 126–27, 167). Moreover, Savage presented evidence to show she reported her concerns to Chariot's top management, who undisputedly made the decision to terminate her employment. (Doc. Nos. 49-11 ¶¶ 12–13; 48 ¶ 23). If this evidence were true, then a jury could easily find that Chariot's performance-related reasons for terminating her or other adverse employment action were pretextual. This is enough to survive summary judgment. Johnson v. UPS, 117 Fed. App'x 444, 453 (6th Cir. 2004).

It is worth emphasizing that the Court must review all the evidence, facts, and inferences in the light most favorable Savage. Matsushita Elec. Indus. Co., 475 U.S. at 587. That evidence includes her deposition testimony. "Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial" as long as the testimony is not "blatantly and demonstrably false." Davis v. Gallagher, 951 F.3d 743, 750 (6th Cir. 2020) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). A reasonable jury considering Savage's testimony could find that Chariot retaliated against Savage for complaining about the company's discriminatory hiring practices. To be sure, Chariot may ultimately prevail on this issue at trial by showing that Savage did not actually *oppose* these practices, or that no one with firing power had knowledge of Savage's complaints. But accepting Savage's testimony as true, and drawing all reasonable inferences in her favor at this stage, the Court cannot conclude that her testimony is so "blatantly and demonstrably false" that "no reasonable jury could believe" her version of events. See Harris, 550 U.S. at 380. Accordingly, the Court will deny Chariot's motion for summary judgment on Savage's Title VII, THRA, § 1981, ADEA retaliation claims.

B.  Sexual Harassment Claims

The Court need not say much about Savage's claims that she was subjected to a hostile

work environment and quid pro quo sexual harassment. Savage testified to dozens of examples of Schnitzer (the Vice President and partial owner of Chariot) either making comments at work about her appearance, having sex with his wife, or that she was "easy." If that were not enough, Savage also testified that Schnitzer brushed up against her breasts and butt multiple times. Viewing this evidence in the light most favorable to Savage, a jury could find that Savage was subjected to a hostile work environment when she (a woman) had to endure these repeated sexually charged comments and actions in the workplace. See Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011) (discussing elements of a hostile work environment claim). It is also more than sufficient for purposes of summary judgment to hold Chariot liable because this behavior came from an *owner* of the company, rather than a mere coworker, who Savage claims was second in command and had authority over all employees. (Doc. No. 48 ¶ 49); see also Vance v. Ball State Univ., 570 U.S. 421, 431 (2013) (holding that an employer is vicariously liable for an employee's unlawful harassment if the employee has the power to take tangible employment actions against the victim); Johnson v. United Parcel Serv., Inc., 117 F. App'x 444, 453 (6th Cir. 2004).

Savage also testified that when she asked for a raise, Schnitzer made comments about his wife needing "to put out" if she wanted him to buy her things. This evidence at least creates an inference that Savage did not receive a raise or other favorable employment actions because she refused "to submit to the unwelcome demands" from Savage. This, too, is enough to survive summary judgment on a quid pro quo sexual harassment claim. Sanford v. Main Street Baptist Church Manor, Inc., 327 F. App'x 587, 596–97 (6th Cir. 2009) (discussing elements of a quid pro quo claim).

Accordingly, the Court disagrees with Chariot's arguments that the "accumulated effect of

11
Case 3:23-cv-01190   Document 59   Filed 08/02/25   Page 11 of 12 PageID #: 1769

work environment and quid pro quo sexual harassment. Savage testified to dozens of examples of Schnitzer (the Vice President and partial owner of Chariot) either making comments at work about her appearance, having sex with his wife, or that she was "easy." If that were not enough, Savage also testified that Schnitzer brushed up against her breasts and butt multiple times. Viewing this evidence in the light most favorable to Savage, a jury could find that Savage was subjected to a hostile work environment when she (a woman) had to endure these repeated sexually charged comments and actions in the workplace. See Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011) (discussing elements of a hostile work environment claim). It is also more than sufficient for purposes of summary judgment to hold Chariot liable because this behavior came from an *owner* of the company, rather than a mere coworker, who Savage claims was second in command and had authority over all employees. (Doc. No. 48 ¶ 49); see also Vance v. Ball State Univ., 570 U.S. 421, 431 (2013) (holding that an employer is vicariously liable for an employee's unlawful harassment if the employee has the power to take tangible employment actions against the victim); Johnson v. United Parcel Serv., Inc., 117 F. App'x 444, 453 (6th Cir. 2004).

Savage also testified that when she asked for a raise, Schnitzer made comments about his wife needing "to put out" if she wanted him to buy her things. This evidence at least creates an inference that Savage did not receive a raise or other favorable employment actions because she refused "to submit to the unwelcome demands" from Savage. This, too, is enough to survive summary judgment on a quid pro quo sexual harassment claim. Sanford v. Main Street Baptist Church Manor, Inc., 327 F. App'x 587, 596–97 (6th Cir. 2009) (discussing elements of a quid pro quo claim).

Accordingly, the Court disagrees with Chariot's arguments that the "accumulated effect of

all the incidents she alleges" do not rise "to the level of actionable hostile work environment, there is no basis for employer lability and finally no factual or legal basis for quid pro quo sexual harassment. (Doc. No. 44 at 2).

## IV. CONCLUSION

For the foregoing reasons, Chariot's Motion (Doc. No. 44) will be granted in part and denied in part. The Court will dismiss Savage's FLSA retaliation claim, but the motion will be denied in all other respects.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE